AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California ▼

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>APPLE INC., ONE APPLE PARK WAY, CUPERTINO,<br>CALIFORNIA, APPLE ID mateocoleman@gmail.com | )<br>)<br>)<br>)<br>)<br>)    Case No.    '22  MJ1995 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the    NORTHERN    District of    CALIFORNIA    , there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1119, 1111 | FOREIGN FIRST-DEGREE MURDER OF U.S. NATIONALS |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA JOSEPH P. HAMER
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ TELEPHONE _____ *(specify reliable electronic means).*

Date:    June 3, 2022

_____
*Judge's signature*

City and state:    SAN DIEGO, CALIFORNIA      MICHAEL S. BERG, U.S. MAGISTRATE JUDGE
_____
*Printed name and title*

### **AFFIDAVIT**

I, Joseph P. Hamer, being duly sworn, declare and state as
follows:

### I.  **INTRODUCTION**

1.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since May 1,
2016.  As a federal agent, I am empowered by United States law
to conduct investigations regarding, and make arrests for,
offenses enumerated in Title 18 of the United States Code.
During my tenure as a Special Agent, I have conducted and
participated in numerous investigations of criminal activity,
executed search and arrest warrants, and seized evidence of
federal criminal violations.  Since April 1, 2019, I have been
assigned to work violent crimes against children at the FBI's
Ventura Resident Agency.  In this role, I am responsible for,
among other things, enforcing federal criminal statutes
involving the sexual exploitation of children.  I have received
both formal and informal training from the FBI regarding
computer-related investigations and computer technology.  My
formal law enforcement training includes 21 weeks of education
at the FBI Academy, where I took classes on writing affidavits
and providing evidentiary testimony, among other topics.  Prior
to my assignment at the Ventura Resident Agency, I was assigned
to the Los Angeles Violent Crime Task Force.  As a member of
this task force, I investigated various violent crimes,
including bank robbery, extortion, kidnapping, and homicide.

2.    This affidavit supports an application by the United

States of America to search the Apple account associated with
Apple ID mateocoleman@gmail.com (the SUBJECT ACCOUNT) stored at
premises owned, maintained, controlled, or operated by Apple
Inc. ("Apple"), an Internet Service Provider headquartered at
One Apple Park Way, Cupertino, California, for content and data
from October 1, 2018 to August 10, 2021, for items that
constitute evidence of violations of federal criminal law,
namely, Title 18, United States Code, Sections 1119 and 1111:
Foreign Murder of United States Nationals (the "SUBJECT
OFFENSE") as described in Attachment B.  On September 8, 2021, a
federal grand jury in the Southern District of California
indicted M. COLEMAN for two counts of the SUBJECT OFFENSE.

     3.   The facts set forth in this affidavit are based on my
own personal knowledge, knowledge obtained from other
individuals during my participation in this investigation,
including other law enforcement officers, interviews of
witnesses, my review of documents and computer records related
to this investigation, communications with others who have
personal knowledge of the events and circumstances described
herein, and information gained through my training and
experience.  Because this affidavit is submitted for the limited
purpose of establishing probable cause in support of the
application for a search warrant, it does not set forth every
fact that I or others have learned during this investigation.

## II. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    A.C. Reported M. COLEMAN Missing.**

4.    On August 9, 2021, Sgt. Larson of the Santa Barbara Police Department ("SBPD") contacted FBI SA Jennifer Bannon regarding a possible parental kidnapping.  Sgt. Larson provided SA Bannon with a copy of a missing person police report that was taken by the SBPD.  I reviewed the police report and learned the following:

a.    On August 7, 2021, SBPD Officer Barriga spoke to A.C. via telephone regarding her husband, M. COLEMAN.  A.C. reported to SBPD that she, M. COLEMAN, and their two children, R.C. (10 months old) and K.C. (two years old),[1] planned to go on a camping trip.  Instead, A.C. said that M. COLEMAN had left their home in Santa Barbara, California (the "Coleman Residence") in the family's Mercedes Sprinter van with R.C. and K.C.  A.C. reported that M. COLEMAN did not tell her where he was going and was not answering her text messages. The officer attempted to contact M. COLEMAN via telephone but received no response.

b.    On August 8, 2021, A.C. called SBPD to follow up on the previous day's report.  SBPD Officer Michael Chung responded to the Coleman Residence and met with A.C., who requested SBPD's assistance in reporting M. COLEMAN and their

_____

[1] According to R.C.'s birth certificate, she was born in September 2020.  According to K.C.'s birth certificate, he was born in October 2018.  Both were born in the United States and were U.S. citizens.  The time period requested under the warrant to search the SUBJECT ACCOUNTS begins the month of K.C.'s birth.

two children missing.  Officer Chung asked A.C. whether she could attempt to use the "Find My iPhone" application to locate M. COLEMAN's phone.  A.C. agreed and turned on a laptop, which showed that M. COLEMAN's last known location was in Rosarito, Baja California, Mexico at approximately 2:24 p.m.

**B.   M. COLEMAN Is Located Returning from Mexico and R.C.'s and K.C.'s Bodies Are Found.**

5.    On August 9, 2021, at about 11:50 a.m., Sgt. Larson, SBPD Detective Davis, and District Attorney Investigator (DAI) Aijian, went to the Coleman Residence where they met A.C.'s friends, T.C. and A.P., who explained that A.C. had just left for San Diego.  T.C. and A.P. showed how they were using the Find My iPhone app on a MacBook Pro computer (the "MacBook") to track M. COLEMAN's iPhone movements in Mexico toward the San Ysidro Port of Entry ("SYPOE").[2]

6.    A.P. and T.C. asked for help coordinating the search for M. COLEMAN, R.C., and K.C.  A.P. and T.C. showed Det. Davis and DAI Ajian a text message from M. COLEMAN's iCloud account on the MacBook.  The text message from M. COLEMAN to A.C. was sent on August 9, at 3:12 a.m., stating: "Hi babe, miss you too. Things have been rough but starting to get some clarity as well.

---

[2] According to Det. Davis's report, A.P. identified the MacBook as belonging to M. COLEMAN and said A.C. was able to log in because she had his password.  Later, A.P. provided the FBI with text messages between her and A.C.  These text messages, which were on August 9 between about 1:23 p.m. and 2:33 p.m., show A.C. providing A.P. with M. COLEMAN's iCloud login and password, and A.C. asking for "any updates on Matt's location" with A.P. responding, "It looks like he is at the border."

Still confused on a lot of things though and processing through them. So many crazy thoughts going through my head right now, hard to explain. Yeah, funny your getting some clarity through my grandmas old bibles. Wasn't there 2? Anyways, was actually still thinking of burning them in case theres a chip in them or something. Going to keep processing through everything and hope to get some answers. Hope all this craziness ends soon. Love you."

7.    A.P. and T.C. also showed Det. Davis and DAI Aijian responsive text messages from A.C. to M. COLEMAN asking if her children were okay, as well as a message from A.C. to M. COLEMAN on August 9 at 9:24 a.m., stating: "We are doing this together babe.  Praying for clarity over you and your mind this morning. Everything you've believed and known to be true is happening right now.  I'm partnering with you from SB.  Let's take back our city.  The gateway of revival for the state of California and the nation and the world.  You were created to change the course of world history.  Take care of my little giant slayer and my the voice of heaven's dove.  They sure are special."

8.    Sgt. Larson thereafter seized the MacBook, and law enforcement obtained search warrants for the MacBook.

9.    At approximately 1:00 p.m., on August 9, M. COLEMAN arrived at the SYPOE in the Mercedes Sprinter van.  M. COLEMAN was referred to Secondary Inspection.  There were no other occupants in the Mercedes Sprinter van.  Federal agents took custody of the Mercedes Sprinter van.  That same day, a Mexican liaison partner with the Secretaria de Seguridad Publica

Municipal de Rosarito relayed to FBI Supervisory Special Agent
Joyce Deniz that they had located two deceased children matching
R.C.'s and K.C.'s descriptions in a ditch at approximately 8:00
a.m. on August 9.

### C.  M. COLEMAN Is Interviewed at the SYPOE.

10.  Later that day, M. COLEMAN was interviewed by FBI SA
Nathaniel Dingle, during which time SA Dingle read M. COLEMAN
his Miranda rights and M. COLEMAN waived his rights and agreed
to speak with agents.  I reviewed the video recorded interview
during which time M. COLEMAN made, among others, the following
statements:

a.   M. COLEMAN confessed to killing his children,
R.C. and K.C.  M. COLEMAN said that he drove his children to
Mexico on Saturday, August 7, 2021.  M. COLEMAN said that he
believed his children were going to grow into monsters so he had
to kill them.  At approximately 5:00 a.m., on August 9, M.
COLEMAN drove south on Descanso Road.  He pulled off to the side
of a road in the area of Rancho Del Cielo.  M. COLEMAN stated
that first he killed R.C., using a spear fishing gun that
pierced R.C. in the heart.  After he killed his children, M.
COLEMAN said that he moved their bodies approximately 30 yards
away and placed them in some brush.[3]  M. COLEMAN stated that he
drove a couple of miles where he then discarded the spear

---

[3] M. COLEMAN provided agents with the approximate location
of the bodies, which coincided with where the bodies were
located by Mexican authorities.

fishing gun and bloody clothes near a creek.  He threw bloody
clothes into a blue trash bin somewhere off the side of a road
in Tijuana, Mexico.

b.     M. COLEMAN said that five or six days ago he
started noticing strange coincidences.  He discussed QAnon[4] and
Illuminati conspiracy theories as well as Strong's numbers (an
index of every word in the Bible).  He said visions and signs
revealed that his wife, A.C., possessed serpent DNA (M. COLEMAN
mentioned that he was not sure if his wife was a shape shifter)
and had passed it onto his children and that all things were
pointing to the idea that his children have corrupted DNA that
will spread if something is not done about it.  M. COLEMAN
explained that he was either crazy or the only person that is
left on Earth that is a true man, and that while he was in
Mexico – before killing his children – M. COLEMAN laid in bed
seeing all the pieces being decoded like "The Matrix," and he
was Neo.[5]  M. COLEMAN also discussed time travel, teleportation,
R.C. and K.C. telling him about babies being placed in
fireworks, food, and walls.  M. COLEMAN explained that his
children were communicating with him; that K.C. told him that
A.C. and a family friend were abusing K.C. and R.C.; and that
eventually M. COLEMAN saw the big picture that he had to kill

---

[4] M. COLEMAN mentioned during the interview that "Q" was
actually talking to him.
[5] "The Matrix" is a science fiction film. Neo is the lead
character.

his children to prevent them from becoming an alien species that would release carnage over the Earth.

      c.    During the interview, M. COLEMAN showed the interviewing agents several hand signals or signs that M. COLEMAN said were an indication that someone was a part of the conspiracy and showing their allegiance.  M. COLEMAN then explained that he scrolled through Instagram and took screenshots of individuals making these hand signals or signs. M. COLEMAN explained that he does not use Facebook anymore, but had recently searched through his friend, A.M.'s, Facebook account and saw a posted photograph of A.M. making one of the gestures over his eye.  M. COLEMAN showed agents the hand gesture.  According to M. COLEMAN, after seeing A.M.'s posting with the hand gesture, M. COLEMAN knew that the "whole thing was a setup" and "they" were using people to get to M. COLEMAN.

      d.    M. COLEMAN identified and initialed photographs of R.C.'s and K.C.'s dead bodies as his children.

      e.    M. COLEMAN said he knew what he did was wrong, but it was the only course of action that would save the world.

      f.    M. COLEMAN signed a consent form allowing the FBI to search his iPhone and provided the passcode.

    **D.  M. COLEMAN Makes Additional Statements About Social Media, Religion, and Conspiracies.**

11.  On August 10, 2021, while I was transporting M. COLEMAN to the Santa Ana jail, M. COLEMAN discussed his religious beliefs, work as a pastor, Nephilim, and the biblical

story of Abraham sacrificing his son Isaac.  Also, on August 10,
while SA Bannon and I were transporting M. COLEMAN to the
Ventura County jail, M. COLEMAN said that about five days before
he left for Mexico, he started to get clarity.  M. COLEMAN said
he saw messages on Instagram that were showing hand signs,
proving "they" were targeting M. COLEMAN, and M. COLEMAN began
to understand what those messages meant.

12.  On August 11, 2021, while I was transporting M.
COLEMAN from Ventura County Jail to the United States Marshals
Service, he explained that he first learned of "Lizard People"
on Twitter and from "that British guy with white hair."[6]

**E.   A.C. is Interviewed at the SYPOE.**

13.  On August 9, 2021, after M. COLEMAN had entered the
SYPOE without his children, FBI SA Zachary Schaefer and SA Jesse
Chappell conducted a Mirandized interviewed of A.C.  I reviewed
the recording of that interview and observed the following:

a.    A.C. explained that she and her husband were
researching QAnon, and M. COLEMAN became significantly more
paranoid that people around him were involved in a conspiracy.
A.C. said that M. COLEMAN started doing a lot of research on
leaders running "the church" and found that they may have been

---

[6] I believe, based on my investigation of this case, "that
British guy with white hair" refers to David Icke, a British
conspiracy theorist with white hair, who has published several
books, including "Children of the Matrix" which describes, among
other things, "Nefilim," "interbreeding [] between the
reptilians and the blond-haired, blue-eyed, Nordic peoples,"
"reptilian DNA," and "'royal' bloodlines[ of] the reptilian-
Nordic hybrids," and their relation to the "Illuminati."

part of the conspiracy.  A.C. explained that M. COLEMAN began seeing "signs" in people's social media posts, and M. COLEMAN believed he was able to connect the people running "the church" to people in their community and to some of their best friends. A.C. said that M. COLEMAN found information on their friends' Instagram accounts that M. COLEMAN believed showed that they were "all in this thing together."  M. COLEMAN even accused A.C. of being a part of the conspiracy.

**F.   Interview of M. COLEMAN's Friend, A.M.**

14.  On August 20, 2021, M. COLEMAN's friend A.M., was interviewed by SA Bannon and me.  During the interview, A.M., told us the following:

a.   M. COLEMAN started noticing "signs" everywhere, including postings on Instagram from musicians, teachers, and his friends.  M. COLEMAN took notice of symbols he saw in photographs.  Approximately three weeks before M. COLEMAN left for Mexico, M. COLEMAN started asking A.M. about these photographs and the hand gestures and symbols depicted in the photographs.  M. COLEMAN stated the people in the photographs making these signs were evil, disguised as good, therefore these people were "compromised."  A.M. also said that on August 5, 2021, two days prior to M. COLEMAN taking his children to Mexico, M. COLEMAN began showing A.M. screenshots from Instagram of A.M.'s closest friends making hand gestures such as peace signs.  M. COLEMAN accused A.M. of being a "loyalist," which was why A.M. could not see that he was being controlled.

b.   Within hours of M. COLEMAN taking his children to Mexico, A.C. called A.M., and A.M. went to the Coleman Residence.  A.C. showed A.M. a Facebook photograph of A.M and his friends when A.M. was approximately 13 years old (making the photograph over 10 years old).  The photograph depicted A.M. and his friends making hand gestures.  Based, at least in part, on these hand gestures, A.M. said that A.C. accused him of "being in on it" and eventually A.C. chased A.M. out of the Coleman Residence.

**G.   M. COLEMAN's Use of Apple Products and iCloud.**

15.  I know based on my training and experience that many owners of Apple products like iPhones, Apple computers, and iPads also have one or more Apple IDs (Apple accounts) used for services, or to make purchases, on Apple platforms. The services may include iCloud which allows users to store data on remote servers ("in the cloud"), apart from the physical Apple device. An iCloud account may be used, for example, to backup data on the user's physical device(s); and/or to ensure the same data (e.g., photos or videos, text messages, files) is available and synchronized across multiple Apple devices that use the same Apple ID.

16.  As indicated above, after M. COLEMAN's arrest, FBI personnel seized M. COLEMAN's Apple iPhone and obtained a warrant to search it.  The MacBook referred to above was M. COLEMAN's Apple computer.  He also had an Apple iPad when he returned to the United States on August 9, 2021.  The iPad is

being searched pursuant to a warrant.  The searches of all three
devices identified mateocoleman@gmail.com (SUBJECT ACCOUNT) as
the Apple ID linked to each device. And I have seen about five
emails on the iPhone that use mateocoleman@icloud.com.  Setting
up an iCloud.com email address is a feature available to iCloud
users.

17.  As indicated above, M. COLEMAN used one or more of his
Apple devices to, among other things, send and receive
communications relevant to the SUBJECT OFFENSE.  And I believe
he used iCloud to store, backup, or synchronize his data.  In
addition to the indications above that he used iCloud, as stated
above, M. COLEMAN's Macbook was at his home in Santa Barbara
while he was in Mexico.  However, the Macbook showed a text
message that he sent to A.C. on August 9, 2021, while he was in
Mexico.  That text message was not on M. COLEMAN's iPhone but
was on M. COLEMAN's iPad that was with him while in Mexico.[7]  I
believe the text appeared on the Macbook, because the iPad and
Macbook, at minimum, synchronized text messages through iCloud.
I therefore believe M. COLEMAN's Apple account may also contain
data relevant to the offense, including communications with
others about where he was, what he was thinking, and what he was
doing around the time of the murders. Some data may duplicate
what is on his physical Apple devices, but the extent of the
overlap is unknown without examining the contents of the Apple

---

[7] As part of this investigation, A.C.'s iPhone was seized
and a search warrant was obtained for the device.  During the
review of the iPhone I saw this text message was received from
mateocoleman@icloud.com.

account.

**H.   Preservation.**

18.   On August 9, 2021, I submitted a Preservation Request
to Apple asking Apple to preserve any accounts associated with
Coleman's name, mateocoleman@gmail.com, two phone numbers used
by Coleman, and his residential address in Santa Barbara.  Apple
said it only had data tied to the Gmail address and phone
numbers.  I renewed the request on November 2, 2021.  The latter
expired after 90 days and was not renewed or extended again.  I
am not aware of any indication the SUBJECT ACCOUNT has been
deleted, however. Coleman has been in custody since August 9,
2021, and agents are reviewing his calls and emails from
custody.  We have not detected any indications he asked anyone
to delete the contents of his Apple account.

**III.  TRAINING AND EXPERIENCE REGARDNG INDIVIDUALS WHO COMMIT
VIOLENT CRIMES AND WHO BELIEVE IN OR PARTICIPATE IN
CONSPIRACY THEORIES.**

19.   Based on my training and experience and my
discussions with other law enforcement personnel, I know that
some people who are arrested for violent crimes will feign
mental illness (i.e., engage in malingering behavior) whereas
others may suffer from legitimate mental illness.  One way to
determine if a person has a legitimate mental illness or is
malingering, or to determine the extent to which a person
understood the nature of their actions, is to examine their
conduct and communications with others in the time around and

leading up to specific events.  For that reason, I believe an
examination of M. COLEMAN's activity and communications will
help establish his true mental state leading up to and around
the time of the murders, as well as his mental state in relation
to R.C., K.C., and A.C.

20.   Additionally, based on my training and experience
and my discussions with other law enforcement personnel, I know
that people who participate in and believe in conspiracy
theories, such as QAnon or Illuminati, will often communicate
with others about such beliefs, search the Internet for
materials pertinent to such beliefs, and save materials
pertaining to such beliefs.

## IV. TRAINING AND EXPERIENCE REGARDING APPLE

21.  Apple is a United States company that produces the
iPhone and iPad, both of which use the iOS operating system, and
desktop and laptop computers based on the Mac OS operating
system.

22.  Apple provides a variety of services that can be
accessed from Apple devices or, in some cases, other devices via
web browsers or mobile and desktop applications ("apps").  As
described in further detail below, the services include email,
instant messaging, and file storage:

> a. Apple provides email service to its users through
>    email addresses at the domain names mac.com, me.com,
>    and icloud.com.

b. iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c. iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices, and also allow for browser history to be stored on the iCloud. iCloud Backup allows users to create a backup of their device data.  iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud

to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e. Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

f. Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g. App Store and iTunes Store are used to purchase and download digital content.  iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

23.   Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  The account identifier for an Apple ID is an email address, provided by the user.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

24.   Apple captures information associated with the creation and use of an Apple ID.  During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status

of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

25.  Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

26.  Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the

unique device identifier ("UDID"), and the serial number.  In
addition, information about a user's computer is captured when
iTunes is used on that computer to play content associated with
an Apple ID, and information about a user's web browser may be
captured when used to access services through icloud.com and
apple.com.  Apple also retains records related to communications
between users and Apple customer service, including
communications regarding a particular Apple device or service,
and the repair history for a device.

     27.  Apple provides users with five gigabytes of free
electronic space on iCloud, and users can purchase additional
storage space.  That storage space, located on servers
controlled by Apple, may contain data associated with the use of
iCloud-connected services, including: email (iCloud Mail);
images and videos (iCloud Photo Library, My Photo Stream, and
iCloud Photo Sharing); documents, spreadsheets, presentations,
and other files (iWork and iCloud Drive); and web browser
settings and Wi-Fi network information (iCloud Tabs and iCloud
Keychain).  iCloud can also be used to store iOS device backups,
which can contain a user's photos and videos, iMessages, Short
Message Service ("SMS") and Multimedia Messaging Service ("MMS")
messages, voicemail messages, call history, contacts, calendar
events, reminders, notes, app data and settings, Apple Watch
backups, and other data.  Records and data associated with
third-party apps may also be stored on iCloud; for example, the
iOS app for WhatsApp, an instant messaging service, can be
configured to regularly back up a user's instant messages on

iCloud Drive.  Some of this data is stored on Apple's servers in
an encrypted form but can nonetheless be decrypted by Apple.

### V.  PROCEDURES FOR ELECTRONICALLY STORED INFORMATION

28.  Federal agents and investigative support personnel are
trained and experienced in identifying communications relevant
to the crimes under investigation.  The personnel of Apple are
not.  It would be inappropriate and impractical for federal
agents to search the vast computer network of Apple for the
relevant account and then to analyze the contents of the account
on the premises of Apple.  The impact on Apple's business would
be disruptive and severe.

29.  Therefore, in order to accomplish the objective of the
search warrant with a minimum of interference with the business
activities of Apple, to protect the privacy of Apple's
subscribers whose accounts are not authorized to be searched,
and to effectively pursue this investigation, the FBI seeks
authorization to allow Apple to make a digital copy of the
entire contents of the SUBJECT ACCOUNT.  That copy will be
provided to me or to any authorized federal agent.  The copy
will be imaged and the image will then be analyzed to identify
communications and other electronic records subject to seizure
pursuant to Attachment B.  Relevant electronic records will be
copied to separate media.  The original media will be sealed and
maintained to establish authenticity, if necessary.

30.  Analyzing the data to be provided by Apple may require
special technical skills, equipment, and software.  It may also

be very time-consuming.  Searching by keywords, for example,
often yields many thousands of "hits," each of which must be
reviewed in its context by the examiner to determine whether the
data is within the scope of the warrant.  Merely finding a
relevant "hit" does not end the review process.  Keyword
searches do not capture misspelled words, reveal the use of
coded language, or account for slang.  Keyword searches are
further limited when electronic records are in or use foreign
languages.  Certain file formats also do not lend themselves to
keyword searches.  Keywords search text.  Many common electronic
mail, database, and spreadsheet applications, which files may be
attachments, do not store data as searchable text.  Instead,
such data is saved in a proprietary non-text format. And, as the
volume of storage allotted by service providers increases, the
time it takes to properly analyze recovered data increases
dramatically.  Internet Service Providers also do not always
organize the electronic files they provide chronologically,
which makes review more time consuming and may require the
examiner to review each page or record for responsive material.

31.  Based on the foregoing, searching the recovered data
for the information subject to seizure pursuant to this warrant
may require a range of data analysis techniques and may take
weeks or even months.  Keywords need to be modified continuously
based upon the results obtained and, depending on the
organization, format, and language of the records provided by
the ISP, examiners may need to review each record to determine
if it is responsive to Attachment B. The personnel conducting

the examination will complete the analysis within 90 days of receipt of the data from the service provider, absent further application to this court.

32.  Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic messages that identify any users of the subject account and any electronic messages sent or received in temporal proximity to relevant electronic messages that provide context to the relevant messages.

33.  All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VI. CONCLUSION

34. Based on the foregoing, I request that the Court issue the proposed search warrant.

35. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Apple. Because the warrant will be served on Apple, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

_____
JOSEPH P. HAMER
Special Agent
Federal Bureau of Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on June __3rd__ , 2022.

_____
MICHAEL S. BERG
United States Magistrate Judge

**<u>ATTACHMENT A</u>**

Apple Inc. ("Apple"), an Internet Service Provider
headquartered at One Apple Park Way, Cupertino, California,
which hosts the account identified by Apple ID
mateocoleman@gmail.com.

**ATTACHMENT B**

**I.**   Service of Warrant

The officer executing the warrant shall permit Apple, Inc.
("Apple"), as custodian of the computer files described in
Section II below, to locate the files and copy them onto
removable electronic storage media and deliver the same to the
officer.

**II.**   Items to be provided by the ISP

For the account identified by Apple ID mateocoleman@gmail.com
(SUBJECT ACCOUNT), Apple shall provide the following:

   a.  All records or other information regarding the
   identification of the account, to include full name,
   physical address, telephone numbers, email addresses
   (including primary, alternate, rescue, and notification
   email addresses, and verification information for each
   email address), the date on which the account was created,
   the length of service, the IP address used to register the
   account, account status, associated devices, methods of
   connecting, and means and source of payment (including any
   credit or bank account numbers);

   b.  All records or other information regarding the
   devices associated with, or used in connection with, the
   account (including all current and past trusted or
   authorized iOS devices and computers, and any devices used
   to access Apple services), including serial numbers, Unique
   Device Identifiers ("UDID"), Advertising Identifiers
   ("IDFA"), Global Unique Identifiers ("GUID"), Media Access
   Control ("MAC") addresses, Integrated Circuit Card ID
   numbers ("ICCID"), Electronic Serial Numbers ("ESN"),
   Mobile Electronic Identity Numbers ("MEIN"), Mobile
   Equipment Identifiers ("MEID"), Mobile Identification
   Numbers ("MIN"), Subscriber Identity Modules ("SIM"),
   Mobile Subscriber Integrated Services Digital Network
   Numbers ("MSISDN"), International Mobile Subscriber
   Identities ("IMSI"), and International Mobile Station
   Equipment Identities ("IMEI");

   c.  The contents of all emails associated with the
   account from October 1, 2018 to August 10, 2021, including
   stored or preserved copies of emails sent to and from the
   account (including all draft emails and deleted emails),

the source and destination addresses associated with each
email, the date and time at which each email was sent, the
size and length of each email, and the true and accurate
header information including the actual IP addresses of the
sender and the recipient of the emails, and all
attachments;

    d.  The contents of all instant messages associated with
the account from October 1, 2018 to August 10, 2021,
including stored or preserved copies of instant messages
(including iMessages, SMS messages, and MMS messages) sent
to and from the account (including all draft and deleted
messages), the source and destination account or phone
number associated with each instant message, the date and
time at which each instant message was sent, the size and
length of each instant message, the actual IP addresses of
the sender and the recipient of each instant message, and
the media, if any, attached to each instant message;

    e.  The contents of all files and other records stored on
iCloud, including all iOS device backups, all Apple and
third-party app data, all files and other records related
to iCloud Mail, iCloud Photo Sharing, My Photo Stream,
iCloud Photo Library, iCloud Drive, iWork (including Pages,
Numbers, Keynote, and Notes), iCloud Tabs and bookmarks,
and iCloud Keychain, and all address books, contact and
buddy lists, notes, reminders, calendar entries, images,
videos, voicemails, device settings, and bookmarks;

    f.  All activity, connection, and transactional logs for
the account (with associated IP addresses including source
port numbers), including FaceTime call invitation logs,
messaging and query logs (including iMessage, SMS, and MMS
messages), mail logs, iCloud logs, iTunes Store and App
Store logs (including purchases, downloads, and updates of
Apple and third-party apps), My Apple ID and iForgot logs,
sign-on logs for all Apple services, Game Center logs, Find
My iPhone and Find My Friends logs, logs associated with
web-based access of Apple services (including all
associated identifiers), and logs associated with iOS
device purchase, activation, and upgrades;

    g.  All records and information regarding locations where
the account or devices associated with the account were
accessed, including all data stored in connection with
Location Services, Find My iPhone, Find My Friends, and
Apple Maps;

h.  All records pertaining to the types of service used;

i.  All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.  All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

III. Search of the data

The search of the data supplied by Apple pursuant to this warrant will be conducted by the FBI and any government personnel working with the FBI as provided in the "Procedures For Electronically Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of October 1, 2018 to August 10, 2021, and to the seizure of data, communications, records, or information:

a) tending to indicate, suggest, discuss, or refer to M. COLEMAN's motives for committing the SUBJECT OFFENSE;

b) tending to indicate M. COLEMAN's state of mind, competency, or coherence in relation to the SUBJECT OFFENSE;

c) tending to discuss or refer to activities in or travel to Mexico in August 2021;

d) tending to indicate a plan to commit or conceal the SUBJECT OFFENSE;

e) about or tending to refer to or indicate interest in QAnon or Illuminati conspiracy theories or Strong's numbers; or

f) tending to identify the user of the SUBJECT ACCOUNT;

which is evidence of violations of Title 18, United States Code, Sections 1119 and 1111: Foreign Murder of United States Nationals (the "SUBJECT OFFENSE").